**EFiled: Sep 28 2022 10:01AM EDT**
**Transaction ID 68178443**
**Case No. 2020-0766-JTL**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE STREAM TV NETWORKS, INC. ) C.A. No. 2020-0766-JTL
OMNIBUS AGREEMENT LITIGATION )

## MEMORANDUM OPINION

Date Submitted: September 21, 2022
Date Decided: September 28, 2022

Steven P. Wood, Andrew S. Dupre, Brian R. Lemon, Sarah E. Delia, Stephanie H. Dallaire, Travis J. Ferguson, McCARTER & ENGLISH, LLP, Wilmington, Delaware; *Attorneys for Plaintiff and Counterclaim Defendant Stream TV Networks, Inc. and for Third-Party Defendants Mathu Rajan and Raja Rajan.*

Jenness E. Parker, Bonnie W. David, Lilianna Anh P. Townsend, Trevor T. Nielsen, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Eben P. Colby, Marley Ann Brumme, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Boston, Massachusetts; *Attorneys for Defendants and Counterclaim Plaintiff SeeCubic, Inc.*

Steven L. Caponi, K&L GATES LLP, Wilmington, Delaware; *Attorney for Interested Party Hawk Investment Holdings Ltd.*

**LASTER, V.C.**

There once was an agreement between Stream TV Networks, Inc., its secured creditors, and fifty-two of its stockholders (the "Omnibus Agreement"). In the Omnibus Agreement, the parties agreed that Stream would transfer all of its assets (the "Legacy Stream Assets") to a newly formed entity controlled by Stream's secured creditors. In exchange, the secured creditors agreed to extinguish their claims against Stream. As part of the deal, Stream's minority stockholders received the right to exchange their shares in Stream for shares in the new entity, and Stream received the right to one million shares of common stock in the new entity. The creditors subsequently formed SeeCubic, Inc. as the entity contemplated by the Omnibus Agreement.

When Stream entered into the Omnibus Agreement in May 2020, it was insolvent and failing. Stream had defaulted on its secured debt. Stream carried more than $16 million in trade debt and had fallen months behind on payments to customers and suppliers. Stream had even failed to make the payments necessary to maintain the patents on its technology, which were essential to its business. Stream's equity was under water and valueless.

Realizing that without a solution, Stream and its stockholders would be left with nothing, a majority of the members of Stream's board of directors (the "Board") approved the Omnibus Agreement. After Stream entered into the Omnibus Agreement, Stream's controlling stockholders reasserted their control and reconstituted the Board. They searched for every argument they could think of for refusing to comply with the Omnibus Agreement.

In September 2020, Stream filed this action, seeking a declaration that the Omnibus Agreement was invalid and an injunction against SeeCubic trying to enforce it. SeeCubic

counterclaimed, seeking a declaration that the Omnibus Agreement was valid and an injunction against Stream trying to interfere with it.

In December 2020, the trial court issued a decision that rejected a barrage of arguments by Stream. The court ruled that it was reasonably probable that the Omnibus Agreement was a valid and enforceable agreement, and the court issued an injunction barring Stream from failing to comply with the agreement. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020) (the "Injunction Decision") (subsequent history omitted). After the issuance of the Injunction Decision, SeeCubic acquired the Legacy Stream Assets and built a business based on them, turning a failing firm into a viable venture. In September 2021, the court granted a motion for summary judgment declaring the Omnibus Agreement to be a valid agreement. The court entered a partial final judgment in favor of SeeCubic, and Stream appealed.

In June 2022, the Delaware Supreme Court reversed the trial court's decision, vacated the partial final judgment, and declared that the Omnibus Agreement could not have become effective without the approval of the holders of a majority of the Class B shares of Stream. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del. 2022) (the "Supreme Court Decision"). The high court remanded for further proceedings. The mandate issued on July 1. Dkt. 237 (the "Mandate").

Stream and SeeCubic disagreed about how to implement the Mandate. Stream argued that the Mandate necessitated the rescission of all of the actions that SeeCubic had taken under the color of the Omnibus Agreement. Stream maintained that anything short of the immediate return of the Legacy Stream Assets would be an affront to the Delaware

2

Supreme Court. SeeCubic argued that it had other claims against Stream and that the court should defer returning any of the Legacy Stream Assets to Stream pending adjudication of those claims.

On August 7, 2022, the trial court entered a partial final judgment which determined that in light of the Mandate, the Omnibus Agreement did not validly transfer legal title to any of the Legacy Stream Assets from Stream to SeeCubic. Dkt. 266 (the "Partial Final Judgment"). The court directed the parties to "cooperate to effectuate the Mandate, including by causing SeeCubic to transfer legal title to the [Legacy Stream Assets] from SeeCubic to Stream as expeditiously as possible." *Id.* ¶ 4.

When the court implemented the Partial Final Judgment, SeeCubic was making efforts to assert the rights of Stream's secured creditors. The secured creditors maintained that they held a security interest in all of the Legacy Stream Assets and that they could levy on the Legacy Stream Assets to satisfy Stream's outstanding debt, which they claimed exceeded £350 million. They asserted that SeeCubic could retain the Legacy Stream Assets as their designee and agent for purposes of exercising the secured creditors' rights.

The Partial Final Judgment enjoined SeeCubic and those acting in concert with it from taking any action to "use, impair, encumber, or transfer the Assets, except as necessary to maintain the Assets in the ordinary course of business and preserve their value pending transfer to Stream." *Id.* ¶ 5 (the "Post-Remand Injunction"). The Post-Remand Injunction prevented the secured creditors from acting in concert with SeeCubic to exercise their creditors' rights.

3

Hawk Investment Holdings Ltd. ("Hawk") is a secured creditor of Stream. Hawk has moved to modify the Post-Remand Injunction to enable Hawk to exercise its creditors' rights. Dkt. 274 (the "Motion").

In its Motion, Hawk details the expansive rights it possesses as a secured creditor, including a security interest in all of the Legacy Stream Assets and a specific pledge of the stock of Stream's wholly owned subsidiaries. The pertinent security agreements provide that after a default by Stream, Hawk has the right to require Stream to marshal and turnover the Legacy Stream Assets so that Hawk can levy on them for purposes of satisfying Stream's debt. The security agreements make clear that Hawk is not limited to pursuing a judicial foreclosure. Although Hawk can follow that course, Hawk also can enforce their rights by extra-judicial means.

Hawk correctly notes that the fact of Stream's default has been established. In the Injunction Decision, this court found that Stream defaulted under the terms of its secured debt no later than February 2020. 250 A.3d at 1023. That finding was not challenged on appeal, and the Supreme Court Decision adopted it. 279 A.3d at 323 n.17.

Hawk has designated SeeCubic as its agent and designee for administering its rights, including for holding the Legacy Stream Assets that are the collateral for the secured debt. Hawk argues that in light of its rights, any unwinding of the transfer of the Legacy Stream Assets under the Omnibus Agreement would be a futile act. With Hawk having made SeeCubic its designee, the Legacy Stream Assets may visit with Stream temporarily, but soon will find themselves back with SeeCubic.

4

In related filings, SeeCubic has supported Hawk's request for relief and argued that leaving SeeCubic in possession of the Legacy Stream Assets has the additional benefit of avoiding difficulties in identifying which of SeeCubic's assets are Legacy Stream Assets. SeeCubic maintains that it acquired some of Stream's assets by means independent of the Omnibus Agreement, so SeeCubic's ownership of those assets is not affected by the Partial Final Judgment. SeeCubic also argues that it has improved other assets such that they are no longer entirely Stream Legacy Assets. SeeCubic views both categories of assets as "Disputed Assets" and argues that they need not be returned to Stream.

The Post-Remand Injunction is a form of injunctive relief. A court of equity has discretion to modify an injunction for good cause shown. *Cf. Berkowitz v. MacPherson*, 1995 WL 1799136, at *1 (Del. Ch. July 24, 1995) (noting the "power of a court of equity to modify an injunction in the light of changed circumstances").

In exercising its discretion, the court has started by considering what ideally should happen as a result of the Mandate. In a world without transaction costs, the optimal course would be to restore the status quo as it existed in fall 2020, before the issuance of the Injunction Decision and the implementation of the Omnibus Agreement. At that point in time, Stream held the Legacy Stream Assets, and SeeCubic was an empty shell. The secured creditors had filed a foreclosure action in Delaware Superior Court, but they had not yet exercised any extra-judicial rights. If the court could re-establish that state of the world, then the parties could go forward as if the Injunction Decision did not issue. At that point, the secured creditors could litigate their foreclosure action and pursue any extra-

5

judicial rights that they might have. For its part, Stream could defend against the secured creditors' actions and attempt to raise capital if it believed it could pay off its debt.

In the real world, that outcome is unachievable. Eighteen months have passed since the issuance of the Injunction Decision. During that time, SeeCubic has operated the business based on the Legacy Stream Assets and transformed its operations. It is thus not possible to restore the parties to the status quo ante. And transaction costs abound. Yet unwinding the transfer of the Legacy Stream Assets is nevertheless the closest possible alternative. The Partial Final Judgment seeks to achieve that result.

Rescinding a transaction is not easy. If it were highly likely that SeeCubic would end up holding the Legacy Stream Assets as Hawk's designee, then a round trip of the Legacy Stream Assets from SeeCubic to Stream and back again would be a futile act. A court of equity will not require a party to engage in a futile act. In addition to being pointless, the transaction costs necessary to pursue a futile effort generate a deadweight loss for society. In that scenario, modifying the Partial Final Judgment could be warranted.

In determining whether good cause exists to modify the Partial Final Judgment, the court therefore has considered three additional factors:

- How difficult will it be to effectuate a transfer of the Legacy Stream Assets from SeeCubic to Stream?

- How strong are the creditors' rights that Hawk possesses (taking into account any ability Stream may have to cure its default or raise defenses)?

- What is the harm that Stream or Hawk/SeeCubic will suffer if the court does not adopt its preferred manner of proceeding?

The idea behind considering these factors is that if it is comparatively easy to effectuate a transfer of Legacy Stream Assets from SeeCubic to Stream, and if the secured creditors will not face a risk of significant harm from the transfer, then the parties should take that step. But if it is relatively difficult to transfer the Legacy Stream Assets from SeeCubic to Stream, and if Stream will not face a risk of significant harm without the transfer, then it would make more sense to allow Hawk to exercise its rights as a creditor.

The first factor is largely dispositive. The parties' submissions make clear that there is a comparatively easy means of transferring the vast bulk of the Legacy Stream Assets from SeeCubic to Stream. That outcome can be achieved by causing SeeCubic to transfer to Stream the equity in what had been Stream's principal operating subsidiary, Technovative Media, Inc. SeeCubic exercised its rights under the Omnibus Agreement through a similar transfer, and it makes sense to unwind that action by reversing that transfer. There will be follow-on issues to resolve, but the transfer offers a means of substantially implementing the Mandate in a single step.

Hawk and SeeCubic have argued that SeeCubic holds some assets that are Disputed Assets, either because they are not Legacy Stream Assets, or because they are not easily segregated from Legacy Stream Assets. SeeCubic's claims on this point seem somewhat exaggerated. In any event, in light of the Mandate, the more important consideration is to require SeeCubic to return Stream's assets expeditiously. If that results in Disputed Assets being returned to Stream, then the implications of that outcome can be addressed in due course. SeeCubic is protected by its ability to pursue an unjust enrichment claim against

7

Stream, and SeeCubic also can assert claims to recover specific Disputed Assets (or the incremental value by which SeeCubic improved them).

The second factor—the strength of the creditors' rights—is also significant, but it does not outweigh the first factor. The court believes that the rights that secure creditors' rights are strong and may well result in Stream having to transfer the Legacy Stream Assets back to SeeCubic in its capacity as Hawk's designee and agent. If it were difficult to restore the Legacy Stream Assets, then that fact would weigh heavily in favor of allowing Hawk to exercise its rights. At a minimum, the court might seek additional information, because much of the factual record is now two years old. Before determining how to proceed, the court might hold an evidentiary hearing to gain better insight into the current state of affairs, or the court might appoint a special master to investigate the situation. But because there is a relatively easy means of restoring the bulk of the Legacy Stream Assets to Stream, it is not necessary to delve deeply into those issues.

The last factor weighs in favor of Stream and against Hawk (and SeeCubic). For obvious reasons, both sides want to possess the Legacy Stream Assets pending the resolution of this dispute. As a result of the Mandate, Stream has equitable title to the Legacy Stream Assets. With that equitable ownership interest comes the right to use the Legacy Stream Assets to conduct business and make efforts to satisfy the claims of Hawk and Stream's other creditors. If Stream does not get the Legacy Stream Assets back, Stream will lose that opportunity forever. Stream therefore faces a threat of irreparable harm.

SeeCubic also faces a degree of harm because it has been running a business using the Legacy Stream Assets for the past eighteen months. As a result of the Supreme Court

8

Decision, however, SeeCubic currently has no equitable right to carry on that business. SeeCubic's interests currently are derivative of Hawk's, and Hawk's only interest is that of a creditor. If Hawk gets paid, then its interests are satisfied. Hawk's interests also can be remedied through the exercise of its creditors' rights after the return of the Legacy Stream Assets. The risk of harm that SeeCubic and Hawk face is not irreparable. If Hawk's rights are as strong as they appear, Hawk faces limited risk.

SeeCubic also does not face irreparable harm to the extent that transferring the Legacy Stream Assets back to Stream requires transfers of Disputed Assets. The court has permitted SeeCubic to assert a claim for unjust enrichment based on the value it has conferred on Stream during the eighteen months when SeeCubic ran a business using the Legacy Stream Assets. That value could be considerable, given that SeeCubic claims to have turned around a failing firm. SeeCubic also can recover the specific value associated with any Disputed Assets that were transferred back to Stream.

Having considered these factors, the court concludes that good cause does not exist to modify the Partial Final Judgment. Hawk's motion is therefore DENIED.